**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                     No. CR 18-4176 JB

STERLING ISLANDS, INC.;
AL-ZUNI GLOBAL JEWELRY, INC.;
JAWAD "JOE" KHALAF; NADER
KHALAF; NASHAT "NASH" KHALAF;
and TAHA "TOM" SHAWAR,

       Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

     **THIS MATTER** comes before the Court on: (i) the Objections to the Presentence Report

[Doc. 125] on Behalf of Nashat Khalaf, filed July 31, 2020 (Doc. 134)("N. Khalaf Objections");

and (ii) the United States' Objections to Nashat Khalaf Presentence Report [Doc. 125], filed July

31, 2020 (Doc. 137)("United States N. Khalaf Objections").   The primary issue is whether

Defendant Nashat "Nash" Khalaf's relevant offense conduct -- selling Southwestern-style art that

he falsely conveyed was American Indian-made -- resulted in a loss amount of $543,747.00 under

the United States Sentencing Guidelines Manual ("Guidelines" or "U.S.S.G.") § 2B1.1, as the

United States Probation Office ("USPO") contends, or if he is responsible for a loss amount less

than $6,500.00, as the United States and Nashat Khalaf agree.   The Court concludes that the

preponderance of the evidence shows that Nashat Khalaf's relevant offense conduct caused a loss

of less than $6,500.00, and that the USPO draws impermissible inferences from unrelated conduct.

Accordingly, the Court sustains N. Khalaf Objections and the United States' N. Khalaf Objections.

**FACTUAL BACKGROUND**

On December 19, 2018, a federal Grand Jury issued a five-count Indictment against Defendants Sterling Islands, Inc., Al-Zuni Global Jewelry, Jawad Khalaf, Nader Khalaf, Nashat Khalaf, Zaher Mostafa, and Taha "Tom" Shawar.  Indictment at 1, filed December 19, 2018 (Doc. 2).  The Indictment charges that, between 2009 and 2015, the Defendants conspired to import from the Republic of Philippines counterfeit American Indian-style art and jewelry that they then sold in New Mexico and Arizona, passing the art and jewelry off as genuinely Native American.  See Indictment ¶¶ 5-9, at 2-8.  Sterling Islands is a corporation registered in the Commonwealth of Virginia, with its primary business office in Albuquerque, New Mexico.  See Indictment ¶ 1, at 1.  Sterling Islands imports Native American-style jewelry, arts, and crafts, from a factory in the Philippines -- a manufacturer called Fashion Accessories 4 U ("Fashion Accessories") -- into the United States, and sells the imported merchandise to wholesale and retail businesses in the State of New Mexico and elsewhere.  Indictment ¶ 1, at 1.  J. Khalaf is Sterling Islands' owner and president, and Nader Khalaf is a manager.  See Indictment ¶ 1, at 1.  Al-Zuni Global is a registered corporation in New Mexico, operating as a wholesale business in Gallup, New Mexico, "specializing in Native-American style jewelry, arts, and crafts."  Indictment ¶ 2, at 1-2.  N. Khalaf is Al-Zuni Global's owner and president, and Mostafa is its vice president.  See Indictment ¶ 2, at 2.  Shawar owns Bullion Jewelers, Inc., "a retail store in Breckenridge, Colorado, specializing in the sale of Native American-style jewelry."  Indictment ¶ 3, at 2.

The Indictment alleges that the Defendants imported Native American-style jewelry, arts, and crafts without legally required indelible markings and that they sold the imported merchandise to customers, falsely representing that Native Americans made the merchandise.  See Indictment

¶ 4, at 2.  According to the Indictment, from approximately 2009 to October, 2015, Sterling Islands,

Al-Zuni Global, J. Khalaf, Nader Khalaf, Nashat Khalaf, Mostafa, and Shawar

> knowingly, unlawfully, and willfully combined, conspired, confederated, agreed,
> and acted interdependently with one another and with others known and unknown
> to the Grand Jury to commit the offenses of smuggling goods into the United States,
> contrary to 18 U.S.C. § 545, and violating the Indian Arts and Crafts Act, contrary
> to 18 U.S.C. § 1159.

Indictment ¶ 5, at 2.

The Indictment states that Sterling Islands purchased Native American-style jewelry, arts,

and crafts from Fashion Accessories and imported them into the United States.  See Indictment ¶

6a, at 3.  Al-Zuni Global received and distributed wholesale quantities of the imported

merchandise.  See Indictment ¶ 6b, at 3.  The imported merchandise bore no permanent country-

of-origin markings, and the Defendants sold the imported merchandise to wholesale and retail

customers in New Mexico, including to customers who placed orders to "copy and reproduce

jewelry, arts, and crafts made by Indian artists."  Indictment ¶¶ 6c-e, at 3.  The Defendants provided

wholesale customers with Native American-style jewelry, arts, and crafts, some of which had

"removable stickers indicating the items were made in the Philippines," and some of which had

permanent country-of-origin markings.  Indictment ¶¶ 6f-g, at 3.  Al-Zuni Global stocked both

American Indian-made goods and non-American Indian-made goods, many of which it labeled as

imported but, in one instance, it displayed "in a manner that suggested they were Indian made."

United States N. Khalaf Objections at 3.  "An examination of Sterling[ Islands'] financial records

. . . reveals $6,355.599.89 in payments from Sterling Islands to [Fashion Accessories] from June

18, 2010, to July 17, 2014."  Presentence Investigation Report ¶ 17, at 6, filed July 9, 2020

(Doc. 125)("N. Khalaf PSR").  Between 2010 and 2014, Fashion Accessories made 298 shipments

to Sterling Islands, five of which the United States Fish and Wildlife Services intercepted.  See N. Khalaf PSR ¶ 22, at 8.  Between 2012 and 2015, Nashat Khalaf "sent checks to Sterling Islands totaling $543,747.00 in exchange for goods."  N. Khalaf PSR ¶ 28, at 10.

The United States' investigation revealed, however, that Al-Zuni Global and its employees "often told purchasers that goods under discussion were imported."  United States' N. Khalaf Objections at 3.  While "undoubtedly" some purchasers of the non-American Indian-made goods were deceived into believing they were purchasing genuine Indian art and crafts, "the government has no reliable way to calculate how many such purchasers there were, who they were, or how much they spent."  United States N. Khalaf Objections at 3-4.  The United States and the USPO thus agree that J. Khalaf and N. Khalaf engaged in a mix of permissible sales and impermissible, misleadingly labeled sales, although the United States has indicated that it has evidence of only one instance of misleading labeling.  See United States J. Khalaf Objections at 3-4.

According to the United States, on or about September 10, 2012, Sterling Islands received a shipment from Fashion Accessories, containing approximately sixty Navajo-style canteens -- ornately decorated and engraved silver in the shape of canteens -- lacking permanent country-of-origin markings.  See Indictment ¶ 14, at 5.  The United States says that, on or about October 13, 2012, Nader Khalaf emailed Fashion Accessories, attaching photographs pursuant to an email request from J. Khalaf.  See Indictment ¶ 15, at 5.  According to the United States, Al-Zuni Global displayed the imported miniature, Navajo-style canteens, lacking permanent country-of-origin markings, for sale in its shop in Gallup.  See Indictment ¶ 24, at 6.  The United States says that, on November 24, 2014, Al-Zuni Global sold four of the canteens to an undercover United States Fish

and Wildlife Service agent without clarifying that they were not Navajo-made.  See Indictment ¶ 25, at 6.

In Count 2, the Indictment charges that, from approximately August 30, 2009, until approximately October 28, 2015, Sterling Islands, J. Khalaf, and Nader Khalaf

> did willfully, fraudulently, and knowingly import and bring into the United States certain merchandise, that is Native American-style jewelry, arts, and crafts, contrary to law, in that the merchandise was not indelibly marked with the country of origin by cutting, die-sinking, engraving, stamping, and some other permanent method . . . [i]n violation of 18 U.S.C. § 545 and 18 U.S.C. § 2 and 19 C.F.R. § 134.43.

Indictment ¶ 32, at 7.  In Count 3, the Indictment charges that, from approximately August 3, 2012, until approximately October 28, 2015, Al-Zuni Global, Nashat Khalaf, and Mostafa

> did willfully, fraudulently, and knowingly receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of merchandise imported contrary to law, that is Native American-style jewelry, arts, and crafts, after the importation thereof, the defendants then knowing that said merchandise had been imported and brought into the United States contrary to law, in that the merchandise was not indelibly marked with the country of origin by cutting, die-sinking, engraving, stamping, and some other permanent method . . . [i]n violation of 18 U.S.C. § 545 and 18 U.S.C. § 2 and 19 C.F.R. § 134.43.

Indictment ¶ 33, at 7-8.  Counts 4 and 5 are levied against all the Defendants with the exception of Shawar (the "Sterling and Al-Zuni Defendants").  Indictment ¶¶ 34-35, at 8-9.  Count 4 charges that the Sterling Islands and Al-Zuni Defendants

> did knowingly display and offer for sale, and did sell, goods, specifically: Native American-style jewelry, arts, and crafts, in a manner that suggested that the goods were Indian produced, an Indian product, and the product of a particular Indian and Indian tribe, resident within the United States, when in truth and in fact, as defendants there and then well knew and believed, the goods were not Indian produced, an Indian product, and the product of a particular Indian and Indian tribe . . . [i]n violation of 18 U.S.C. § 1159 and 18 U.S.C. § 2.

Indictment ¶ 34, at 8.  Count 5 charges that the Sterling and Al-Zuni Defendants:

did knowingly display and offer for sale, and did sell for $1000 or more, a good, specifically: Native-American style jewelry, arts, and crafts, in a manner that suggested that the goods were Indian produced, an Indian product, and the product of a particular Indian and Indian tribe, resident within the United States, when in truth and in fact, as defendants there and then well knew and believed, the goods were not Indian produced, an Indian product, and the product of a particular Indian and Indian tribe . . . [i]n violation of 18 U.S.C. § 1159 and 18 U.S.C. § 2.

Indictment ¶ 35, at 8-9.  The Indictment also includes a forfeiture allegation, pursuant to 18 U.S.C.

§ 981(a)(1)(c) and 28 U.S.C. § 2461.  See Indictment at 9-10.

## PROCEDURAL BACKGROUND

On April 29, 2020, Nashat Khalaf pled guilty to Count 5.  See Plea Agreement ¶ 9, at 5, filed April 29, 2020 (Doc. 118)("N. Khalaf Plea Agreement").  Nashat Khalaf admits that, on October 28, 2015, in Al-Zuni Global's Gallup store, he "knowingly cause[d] to be displayed and offered for sale at a total price of $1,000.00 or more, canteens that were not Indian-produced in such a manner that the canteens that were not Indian-produced reasonably may have been mistaken as Indian-produced."  N. Khalaf Plea Agreement ¶ 10, at 6.  The United States and Nashat Khalaf agree that a sentence between 0 and 12 months imprisonment is appropriate.  See N. Khalaf Plea Agreement ¶ 12.a, at 7.

The United States and Nashat Khalaf also agree that the United States "could not prove by a preponderance of the evidence that the loss amount attributable to the criminal conduct of all Defendants in this matter was $6,500.00 or more."  N. Khalaf Plea Agreement ¶ 12.c, at 7.  They further agree that "[a]ny other sales or transactions not stated" in the Defendants' factual admissions and which might be considered a violation of 18 U.S.C. § 1159 were "not within the scope of any jointly undertaken activity and were not reasonably foreseeable by Defendant[s]."  N. Khalaf Plea Agreement ¶ 12.d, at 7.  Last, the Defendants "release any claim to the $288,738.94

the United States seized on or about October 28-29, 2015," and the Defendants agree "to collectively provide a total of an additional $300,000 to the Indian Arts and Crafts Board, an agency within the Department of Interior whose mission is to promote the economic development of American Indians and Alaska Natives through the expansion of the Indian arts and crafts market." N. Khalaf Plea Agreement ¶ 6, at 3-4 (internal quotation marks omitted).

The USPO calculates a base offense level of 6 pursuant to § 2B1.1. <u>See</u> N. Khalaf PSR ¶¶ 47-48, at 12. The USPO adds a 12-level enhancement under § 2B1.1(b)(1)(G), however, because "the loss was more than $250,000 but less than $550,000." N. Khalaf PSR ¶ 48, at 12. The United States and Nashat Khalaf filed Objections, arguing that Nashat Khalaf's offense conduct involved no more than $6,500.00 in illicit sales. <u>See</u> United States N. Khalaf Objections at 2-5; N. Khalaf Objections at 4-6.

<u>LAW REGARDING THE GUIDELINES</u>

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory. In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." <u>United States v. Booker</u>, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that  the Guidelines are one of several factors which § 3553(a) enumerates and they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing

the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d at 1264, overruled on other grounds by Rita v. United States, 551 U.S. 338, 349, (2007), as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251 n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351.  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[1]

---

[1]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should

begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

> . . . .

> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances."  Irizarry v. United States, 553 U.S. 708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24, (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

Guidelines sentence. See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89.

**LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS
UNDER THE GUIDELINES**

In Apprendi v. New Jersey, 530 U.S. 466 (2000)("Apprendi"), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge

may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. at 303 (emphasis and citations omitted). In United States v. Booker, however, the Supreme Court held that, because the sentencing guidelines are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges -- the statute falls outside the scope of *Apprendi*'s requirement." (alterations and internal quotations marks omitted)). More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 570 U.S. 99, 103 (2013).

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute, and of distributing, methamphetamine. See 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the Guidelines. See 408 F.3d at 682. The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78

months to 121 to 151 months.  See 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that,

both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts

maintained the power to consider the broad context of a defendant's conduct, even when a court's

view of the conduct conflicted with the jury's verdict."  408 F.3d at 684.  Although United States

v. Booker made the Guidelines ranges "effectively advisory," the Tenth Circuit reaffirmed that

"district courts are still required to consider Guideline ranges, which are determined through

application of the preponderance standard, just as they were before."  United States v. Magallanez,

408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a

dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held

that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United

States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11

F.3d 1510, 1516 (10th Cir. 1993)).[2]  "[T]he application of an enhancement . . . does not implicate

---

[2]Although the Tenth Circuit stated in United States v. Washington that "the issue of a
higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth
Circuit has since classified its holding as leaving "open the possibility that due process may require
proof by clear and convincing evidence before imposition of a Guidelines enhancement that
increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d
1307, 1314 (10th Cir. 2013)(quoting United States v. Olsen, 519 F.3d at 1105).  See United States
v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for
sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v.
Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or
dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's
sentence.  United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether
a higher standard of proof is required to sentence a defendant for committing perjury in relation to
a grand jury investigation, because the enhancement did not require the district court to determine
that the defendant committed murder, but only that he obstructed a homicide investigation).  See
United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-
of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States
v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a

the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *3 (D.N.M. June 26, 2012)(Browning, J.).

The Tenth Circuit applies Apprendi's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi only where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 2014 WL 6679446, at *6 (10th Cir. 2014)[3](holding that, after

---

dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

[3]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Hendrickson and United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence"). The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v. United States, . . . 133 S. Ct. 2151 . . . (2013), expands the rule from Apprendi v. New Jersey, 530 U.S. 466 . . . (2000)(holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence. See [United States v. Sangiovanni,] 2014 WL 4347131, at *22-26 [(D.N.M. 2014)(Browning, J.)].

United States v. Cervantes-Chavez, No. CR 14-0259 JB, 2014 WL 6065657, at *14 (D.N.M. Nov. 3, 2014)(Browning, J.).

## ANALYSIS

The Court concludes that the preponderance of the evidence does not demonstrate that Nashat Khalaf is responsible for the loss amounts that the USPO attributes to him. The USPO confuses Al-Zuni Global's total transactions with the Philippines supplier with conduct that verifiably violates the Indian Arts and Crafts Act. While the Court does not doubt that they each may have caused losses greater than $6,500.00, the Court agrees with the United States and Nashat Khalaf that there is no evidence of any such violation beyond the set of counterfeit Navajo-style canteens that Nashat Khalaf passed off as genuine, Indian-made art. Accordingly, the Court sustains the United States N. Khalaf Objections and the N. Khalaf Objections.

## I.    THE PREPONDERANCE OF THE EVIDENCE DOES NOT DEMONSTRATE THAT NASHAT KHALAF'S RELEVANT OFFENSE CONDUCT INVOLVED BETWEEN $250,000.00 AND $550,000.00 IN LOSS.

The Court concludes that the USPO mistakenly characterizes all Nashat Khalaf's transactions with Sterling Islands as illicit conduct. Instead, the Court concludes that the proper

analysis under §§ 1B1.3 and 2B1.1 requires the Court to consider the extent to which Nashat Khalaf's conduct involved counterfeit Native American arts and crafts, or the extent to which Nashat Khalaf intended to deceive customers into buying such products. The Court also concludes, contrary to the USPO's assertion, that the fact that Nashat Khalaf imported arts and crafts from the Philippines which lacked indelible country-of-origin markings does not demonstrate that Nashat Khalaf intended to pass each such good off as genuine Native American arts and crafts. Because the United States has not proven by a preponderance of the evidence that Nashat Khalaf intended to cause or did cause loss greater than $6,500.00, the Court sustains the United States' and Nashat Khalaf's Objections.

Nashat Khalaf pled guilty to violating 18 U.S.C. § 1159, which makes it a crime to "offer or display any good, without or without a Government trademark, in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian tribe or Indian arts and crafts organization[.]" 18 U.S.C. § 1159(a).[4] See N. Khalaf Plea Agreement ¶ 9, at 5-6. The PSR's ¶ 42 states:

> In summary, Nashat Khalaf . . . knowingly displayed and offered for sale, and did sell $1000 and more of goods, specifically [N]ative American jewelry, arts and crafts, in [a] manner that suggested that the goods were Indian produced, or an Indian product. Further, Nashat Khalaf[] can be directly attributed to $543,747.00 from 2009 to 2015 in purchases from Sterling Islands and [Fashion Accessories].

---

[4]Section 1159 is an infrequently prosecuted statute, with only eight such cases listed in Westlaw, one of which involved prosecution against a Native American who sold his own arts and crafts, but who was not a member of a federally recognized tribe; although his art, in literal terms, was Native American-made, it was not Native American-made under the statute's terms. See United States v. Natchez No. CR 15-2843-MCA, 2016 WL 9777188, at *10 (D.N.M. June 21, 2016)(Armijo, C.J.).

N. Khalaf PSR ¶ 42, at 11.  The USPO apparently arrives at this figure by totaling all checks that Nashat Khalaf sent to Sterling Islands "in exchange for goods" between August, 2012, and October, 2015.  N. Khalaf PSR ¶ 38, at 10.  The USPO also makes much of the fact that most of the products that Nashat Khalaf purchased from Sterling Islands lacked indelible markings showing that the products were made in the Philippines, but instead had removable stickers, in violation of 19 U.S.C. § 1304 and 19 C.F.R. § 134.43.  See N. Khalaf PSR ¶ 19, at 7.  The USPO avers that, because these products were not indelibly marked as originating from the Philippines, they were prone to being passed off as genuinely American Indian-made.  See N. Khalaf PSR ¶ 19, at 7.

Nashat Khalaf notes that his "offense of conviction here is the display for sale of one single box of silver canteens that [he] knew reasonably may have been mistaken for Native American-made arts and crafts," but he argues that the PSR "reverts to the disproven [Fish and Wildlife Service] narrative of Sterling Islands operating as the hub of an organized crime ring, which the evidence in this case showed was completely false."  N. Khalaf Objections at 2-3.  He further asserts that Al-Zuni Global "properly identified both in signage and verbally all of the imported jewelry on display as Non-Indian made."  N. Khalaf Objections at 3.  Nashat Khalaf also argues that the USPO assumes that "every dollar" that he paid Sterling Islands represents intent to pass off counterfeit arts and crafts.  N. Khalaf Objections at 4.  The United States agrees that the "pecuniary loss in this case should be the amount of money purchasers spent on imitation Native American-style good that were offered or displayed at Al-Zuni Global Jewelry," but the United States says that it "has no meaningful estimate of what this loss amount is."  United States N. Khalaf Objections at 3.  The United States notes, however, that Nashat Khalaf "often told

prospective purchasers that goods under discussion were imported," and that the United States "has no reliable way to calculate" how many of Al-Zuni Global's customers falsely believed that they were purchasing genuine, American Indian-made arts and crafts.  United States N. Khalaf Objections at 3-4.

"The district court's determination of relevant conduct is a factual finding subject to a preponderance of the evidence standard, and clear error review." United States v. Schmidt, 353 F. App'x at 135 (citing United States v. Zapata, 546 F.3d 1179, 1192 (10th Cir. 2008)).  Section 2B1.1 provides a sliding-scale offense level that increases with an offense's "loss."  U.S.S.G. § 2B1.1(b)(1).  Loss is "the greater of actual or intended loss."  U.S.S.G. § 2B1.1, Application Note 3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.SG. § 2B1.1, Application Note 3(A)(i).  "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense."  U.S.S.G. § 2B1.1, Application Note 3(A)(ii). "Offense" within the definition of either actual or intended loss refers to a defendant's relevant conduct, as determined by § 1B1.3.  See United States v. Holbert, 285 F.3d 1257, 1261, 1261 n.3 (10th Cir. 2002)(explaining that the Guidelines explicitly differentiate between the terms "offense of conviction," which "encompasses only facts immediately related to the specific offense for which the defendant was convicted," and "offense," which "'means offense of conviction and all relevant conduct,'" and that, "[w]hen the Sentencing Commission intends to limit the applicability of a victim-related enhancement" to the offense of conviction, "it does so explicitly")(quoting U.S.S.G. § 1B1.1, Application Note 1(H)); Robert W. Haines, Jr., Frank O. Bowman III, & Jennifer C. Woll, Federal Sentencing Guidelines Handbook § 2B1.1, § 5, at 335 (2012-13 ed.)("Guidelines Handbook")(explaining that the United States Sentencing Commission intended

for the meaning of "offense" to refer to a defendant's relevant conduct under U.S.S.G. § 1B1.3 and that the omission of a cross-reference to § 1B1.3 in the application notes to § 2B1.1 is of no "substantive significance," because "the drafters apparently felt that the cross-reference to § 1B1.3 was unnecessary because the relevant conduct rules apply to all offense types")).  Additionally, "the Commission makes clear that a loss that 'resulted from' an offense is one that would not have occurred but for the occurrence of the offense," but a defendant's liability is limited to those losses "foreseeable to a reasonable person."   Guidelines Handbook § 5, at 334 (emphasis in original)("The loss definition in 2B1.1 . . . insists, as a minimum, that the defendant's offense have been a cause-in-fact of the economic harm at issue.").

When the loss amount is disputed, the United States bears the burden of establishing its estimation of loss by a preponderance of the evidence.  See Guidelines Handbook § 14, at 353. The Tenth Circuit has, accordingly, ruled that a district court cannot include losses in its calculation under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute."  United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012).  Next, the United States must "prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence." United States v. Kieffer, 681 F.3d at 1168 (citing United States v. Peterson, 312 F.3d 1300, 1302 (10th Cir. 2002)).  For example, in United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814 (D.N.M. June 22, 2012)(Browning, J.), the Court determined that an enhancement pursuant to § 2B1.1(b)(1) was unwarranted, because, although the United States contended that a New Mexico Corrections Department facilities manager awarded four million dollars' worth of

state government contracts to a developer in exchange for bribes, the United States submitted no evidence regarding the profit, if any, the developer received from the contracts.  See 2012 WL 2574814, at *1, 9-10.  The Court noted that, without "evidence regarding the value of the benefit Moya received under these government contracts, the United States cannot establish by a preponderance of the evidence that an . . . enhancement is appropriate" under § 2B1.1(b)(1).  2012 WL 2574814, at *10.

The USPO's loss calculation rests primarily on two assumptions.  First, the USPO tends to construe as criminal conduct Nashat Khalaf's business of selling Native American-style jewelry that was not in fact American Indian-made.  Second, the USPO assumes that, because most of the Defendants' imported products lacked indelible country-of-origin markings, it can be inferred that the Defendants intended to pass these products off as American Indian-made.  It is not a crime to sell Native American-style jewelry, however, if the seller does not falsely represent the jewelry as American Indian-made.  See 25 C.F.R. § 309.9 ("A non-Indian can make and sell products in the style of Indian art or craft products only if the non-Indian or other seller does not falsely suggest to the consumers that the products have been made by an Indian.").  Because it is not a crime, in and of itself, for non-Native Americans to sell Southwestern-style jewelry, for sentencing purposes the United States must prove specific criminal conduct -- instances in which Nashat Khalaf falsely suggested to customers that his products were genuinely Indian-made.  Section 1B1.3 provides that a defendant's Guidelines base offense level "shall be determined," in part, based on "all reasonably foreseeable acts and omissions . . . in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."

U.S.S.G. § 1B1.3(a)(1)(B).  Courts typically may consider only criminal conduct under § 1B1.3, see, e.g., United States v. Dove, 247 F.3d 152, 155 (4th Cir. 2001), so, in calculating Nashat Khalaf's loss amount, the Court may not equate the sum total of Al-Zuni Global's transactions with Sterling Islands with the loss for which Nashat Khalaf is responsible.

The United States has conceded that it "has no reliable way to calculate" the loss that Nashat Khalaf's relevant offense conduct entails, United States N. Khalaf Objections at 4, and this concession factors heavily into the Court's analysis, see United States v. Kieffer, 681 F.3d at 1168. Also, the Court need not merely resolve this uncertainty in the Nashat Khalaf's favor, because the record is replete with examples that contradict the USPO's equating the Defendants' total transactions with criminal conduct.  For example, Mostafa repeatedly told Fish and Wildlife Service agents that "[a]ll the jewelry here is [from] overseas," Mostafa - Canteen Undercover Purchase Transcript at 2, filed July 31, 2020 (Doc. 133-1)("Mostafa Tr."), and that genuine American Indian-made products would cost over ten times what Al-Zuni was charging for Philippines-made products, see Mostafa Tr. at 15.  Further, there were signs throughout Al-Zuni Global that identified items that were not Indian-made.  See "Non-Indian Rings' Signage," N. Khalaf Objections at 5 (Figures 1 and 2).

Photo # DSC0504

**"Non-Indian Rings" Signage**



Figure 1

Photo # DSC0484

**"Non-Indian Rings" Signage**



Figure 2

Similarly, at a trade show in Tucson, Arizona, Al-Zuni's attendant accurately told an undercover Fish and Wildlife Service agent which products were Indian-made and which products were imported.  See Report of Investigation No. 015 at 3, filed July 31, 2020 (Doc. 133-22)("Report No. 15")("[The agent] did not observe any items being sold by AL ZUNI in violation of the IACA while at the [trade] show.").  The same happened at another Tucson trade show the following year; when a Fish and Wildlife Service undercover agent "purchased the items he asked [Mostafa] for the identity of the artist who made the items.  [Mostafa] told [the agent] that the items were imported."  Report of Investigation No. 009 at 1, filed July 31, 2020 (Doc. 134-3)("Report No. 09").

The record contains proof of only one instance in which Nashat Khalaf falsely conveyed that products were Indian-made.  On October 28, 2015, Al-Zuni placed a box of twelve Navajo-style canteens on a table with American Indian-made jewelry without identifying that the canteens were imported from the Philippines.  See N. Khalaf PSR ¶ 33, at 10.  The canteens also lacked identifying markers or labels indicating their imported status.  See N. Khalaf PSR ¶ 33, at 15.  The canteens were listed at $85.00 each.  See Photograph of Canteens at 1, filed July 31, 2020 (Doc. 133-17)(Figure 3).



Figure 3

With the canteens valued at $85.00 each, this incident demonstrates, at most, a loss amount of $1,020.00. The record contains no other instances in which Nashat Khalaf sold imported Southwestern-style jewelry or crafts that he fraudulently passed off as American Indian-made. The USPO's inference that the sum total of Al-Zuni Global's business transactions with Sterling Islands should be tallied as loss attributable to Nashat Khalaf is thus not reasonable. Accordingly, there is no evidence of actual loss greater than $1,020.00, which puts Nashat Khalaf's base offense level within § 2B1.1(b)(1)(A), which provides no increase in his base offense level. This conclusion is consistent with § 1159's purpose, which is to protect Native American artists from non-Native Americans selling counterfeit products, siphoning revenue from those artists. See, e.g., William J. Hapiuk, Jr., Of Kitsch and Kachinas: A Critical Analysis of the Indian Arts and Crafts Act of 1990, 53 Stan. L. Rev. 1009 (2001). The only instance of such siphoning in the record is the sale of the $1,020.00 in Navajo-style canteens.

Section 2B1.1, however, also measures loss by the defendant's intent.  See U.S.S.G. § 2B1.1, Application Note 3(A)(ii).  "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense."  U.S.S.G. § 2B1.1, Application Note 3(A)(ii).  On this point, the USPO's conclusions rely heavily on its assumption that failure to mark imported jewelry with indelible country-of-origin labels means that the Defendants intended to pass off the jewelry as genuinely Indian-made.  See N. Khalaf PSR ¶ 19, at 7 ("Without an indelible marking, the jewelry can be readily separated . . . to make it impossible for an unsuspecting consumer to determine the jewelry's country of origin.").  As a preliminary matter, the Defendants' failure to use indelible country-of-origin markings does not necessarily entail a crime.  Section 1304 of Title 19 of the United States Code provides that "every article of foreign origin . . . imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit[.]"  19 U.S.C. § 1304(a).  Section 1304 allows for fines of not more than $250,000.00 and/or imprisonment for less than one year.  See 19 U.S.C. § 1304(l).  Treasury Regulation 19 C.F.R. § 134.43 provides in relevant part:

(c)     Native American-style jewelry --

(1)     Definition.  For the purposes of this provision, Native American-style jewelry is jewelry which incorporates traditional Native American design motifs, materials and/or construction and therefore looks like, and could possibly be mistaken for, jewelry made by Native Americans.

(2)     Method of marking.  Except as provided in 19 U.S.C. 1304(a)(3) and in paragraph (c)(3) of this section, Native American-style jewelry must be indelibly marked with the country of origin by cutting, die-sinking, engraving, stamping, or some other permanent method.  The indelible marking must appear legibly on the clasp or in some other conspicuous location, or alternatively, on a metal or plastic tag indelibly marked with the country of origin and permanently attached to the article.

     (3)    Exception.  If it is technically or commercially infeasibly to mark in the manner specified in paragraph (c)(2) of this section, or in the case of a good of a [North American Free Trade Association] country, the article may be marked by means of a string tag or adhesive label securely affixed, or some other similar method.

19 C.F.R. § 134.43(c).  The Court previously has concluded that § 134.43 constitutes a law for 18 U.S.C. § 545's purposes.  See United States v. Sterling Islands, Inc., 391 F. Supp. 3d 1027, 1041 (D.N.M. 2019)(Browning, J.).  Nonetheless, while § 134.43(c)(1) requires that jewelry be indelibly marked with its country of origin if it incorporates "traditional Native American motifs, materials and/or construction," no rule or regulation defines this phrase.  Most importantly, the regulation provides that "the article may be marked by means of a string tag or adhesive label" if "it is technically or commercially infeasible" to mark the jewelry indelibly.  19 C.F.R. § 134.43(c)(3).  The United States makes no argument that it was commercially feasible to mark indelibly all the jewelry which the Defendants imported from the Philippines, and so the Defendants' use of adhesive country-of-origin labeling does not necessarily amount to a crime.  The USPO thus stretches to conclude that the lack of indelible markings necessarily implies criminal conduct and thus intent to cause "loss" within § 2B1.1's meaning.  U.S.S.G. § 2B1.1.

     Also relevant is the fact that the United States did not charge Nashat Khalaf with violating 19 U.S.C. § 1304, which the N. Khalaf PSR cites to imply that the imported jewelry's lack of indelible markings is indicative of criminal conduct and thus relevant under § 1B1.3.  See N. Khalaf PSR ¶ 19, at 7.  Section 1304 provides that all imported "article[s] of foreign origin . . . shall be marked" to indicate country of origin "in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit."  19 U.S.C. § 1304(a).  Nashat Khalaf contends that, because he was not charged with violating § 1304, the Court may not

consider conduct violative of § 1304 under § 1B1.3.  See N. Khalaf Objections at 9.  This assertion

is not entirely accurate, because the Court may consider, as relevant conduct, actions that have not

resulted in a conviction.  See, e.g., United States v. Archuleta, No. CR 14-0922 JB, 2017 WL

2297129, at *10 (D.N.M. April 24, 2017)(Browning, J.).  Nonetheless, relevant conduct under

§ 1B1.3 must be indicative of conviction's extent and seriousness.  See, e.g., Witte v. United States,

515 U.S. at 403 (noting that sentencing enhancements do not punish a defendant for uncharged

offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a

more serious sentence within the authorized range if it was either accompanied by or preceded by

additional criminal activity").  Moreover, the Tenth Circuit has ruled that a district court cannot

include losses in its calculation under § 2B1.1 until the "Government first . . . prove[s] by a

preponderance of the evidence that the conduct giving rise to those losses (1) was a part of

Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state

statute." United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012)(emphases added).  As the

Court has concluded, the lack of indelible markings is not necessarily a crime.  To be relevant

under § 1B1.3, therefore, the United States must tie the lack of indelible markings to Nashat

Khalaf's offense of passing off Southwestern-style canteens as American Indian-made, such that

the lack was part of Nashat Khalaf's ongoing scheme.  See United States v. Kieffer, 681 F.3d at

1168.

        The United States has not proven that Al-Zuni Global imported goods without indelible

markings with the intent to pass them off fraudulently as genuinely American Indian-made.

Instead, while many of the imported goods lacked indelible country-of-origin markings, the United

States' investigation revealed only one instance in which Nashat Khalaf or other Al-Zuni Global

employees did not convey -- either through adhesive labeling, signage, or verbal representation -- that the goods were imported rather than American Indian-made.  The lack of indelible country-of-origin markings, therefore, cannot, by itself, demonstrate an intent to defraud that equals the value of the sum total of adhesive-labeled, imported goods.  Because there is no evidence of actual or intended loss greater than $1,020.00 -- the improperly marketed canteens' value -- the Court sustains the United States and Nashat Khalaf's Objections, and declines to apply the § 2B1.1 enhancement to Nashat Khalaf's base offense level.  Nashat Khalaf's base offense level is therefore 4.  See U.S.S.G. § 2B1.1(b)(1)(A).  The Court notes, however, that, while the lack of indelible markings does not justify a § 2B1.1(b)(1) enhancement, the Court may consider this information in determining Nashat Khalaf's sentence, and so the parties may argue the  importance of the lack of indelible markings at Nashat Khalaf's sentencing hearing.  See 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Similarly, the Court is not convinced that the loss inherent to importing goods without indelible country-of-origin markings is equal to those goods' sum value.  As the United States notes, if Nashat Khalaf were convicted of smuggling counterfeit goods, the Court would likely measure the loss amount based on the tax loss that the United States suffered, rather than the price of the goods themselves.  See United States' N. Khalaf Objections at 5; U.S.S.G. § 2T3.1.  And as the United States notes, the "tax loss, if any, would surely have been small in relation to the value of the goods themselves."  United States' N. Khalaf Objections at 5.

Last, Nashat Khalaf asserts that the Court should amend the PSR to "add a bullet point addressing COVID-19, and [his] risk factors for COVID-19," because he is seventy-three years old. N. Khalaf Objections at 12. The United States does not respond to Nashat Khalaf's request. The USPO says that it "notes this information but is not considering it as a variance factor," and so "the PSR will remain unchanged." Addendum to the Presentence Report at 4, filed August 10, 2020 (Doc. 140)("N. Khalaf Addendum"). Although Nashat Khalaf does not expressly invoke his COVID-19 risk factors to seek a variance but rather asserts that his risk of contracting and perhaps dying from COVID-19 in prison is relevant to his sentence, he seeks to amend the PSR's section titled "'Factors That May Warrant A Sentence Outside the Advisory Guideline System.'" N. Khalaf Objections at 12 (quoting N. Khalaf PSR ¶ 100, at 20). Rule 32 of the Federal Rules of Criminal Procedure provides that the PSR must "identify any basis for departing from the applicable sentencing range" as well as "any other information that the court requires, including information relevant to the factors under 18 U.S.C. § 3553(a)." Fed. R. Crim. P. 32(2)(A), (G). The Court sees no reason to amend the PSR as Nashat Khalaf requests. His age is readily apparent from the PSR, and the Court is well-aware of the COVID-19 pandemic, and its presence in the federal prison and corrections system. Instead of amending the PSR, the Court invites Nashat Khalaf to argue that his age places him outside the heartland of cases that his total offense level and criminal history category represents. See U.S.S.G. § 5H1.1 ("[C]onsiderations base on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.").

In sum, the Court declines to apply a 12-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G). Nashat Khalaf's base offense level is thus 6. See U.S.S.G. § 2B1.1(a)(2). With

a criminal history category of I, Nashat Khalaf's Guideline sentencing range is 0 to 6 months

imprisonment.  See U.S.S.G. § Sentencing Table.

　　　　**IT IS ORDERED** that the (i) Objections to the Presentence Report [Doc. 125] on Behalf

of Nashat Khalaf, filed July 31, 2020 (Doc. 134), is sustained with regard to Nashat Khalaf's base

offense level; and (ii) United States' Objections to Nashat Khalaf Presentence Report [Doc. 125],

filed July 31, 2020 (Doc. 137), is sustained.


_____
UNITED STATES DISTRICT JUDGE


*Counsel:*

John C. Anderson
　United States Attorney
Jonathan M. Gerson
Kristopher N. Houghton
Sean J. Sullivan
　Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

　　　*Attorneys for the Plaintiff*


Mark T. Baker
Matthew M. Beck
Peifer, Hanson & Mullins and Baker, P.A.
Albuquerque, New Mexico

--and--

Carter B. Harrison, IV
Harrison & Hart
Albuquerque, New Mexico

  *Attorneys for Defendants Sterling Islands, Inc.,
      Jawad Khalaf, and Zaher Mostafa*

Hope Eckert
Albuquerque, New Mexico

  *Attorney for Defendant Al Zuni Global Jewelry, Inc.*

Ahmad Assed
Richard J. Moran
Law Office of Ahmad Assed
Albuquerque, New Mexico

  *Attorneys for Defendant Nader Khalaf*

John W. Boyd
Nancy Hollander
Karen Grohman
Freedman Boyd Hollander Goldberg Urias & Ward, P.A.
Albuquerque, New Mexico

  *Attorneys for Defendant Nashat Khalaf*